### UNITED STATES DISTRICT COURT
### DISTRICT OF MASSACHUSETTS
### SPRINGFIELD DIVISION

| | |
|---|---|
| FRANK HOLT and NORMAN HART, derivatively on behalf of SMITH & WESSON HOLDING CORP., <br><br> Plaintiffs, <br><br> v. <br><br> MICHAEL F. GOLDEN, AMARO GONCALVES, P. JAMES DEBNEY, MITCHELL A. SALTZ, ROBERT L. SCOTT, JEFFREY D. BUCHANAN, JOHN B. FURMAN, I. MARIE WADECKI, and BARRY M. MONHEIT, <br><br> Defendants, <br> and <br><br> Nominal Defendant SMITH & WESSON HOLDING CORP. | Case No. <br><br> **JURY TRIAL DEMANDED** |

### VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

Plaintiffs Frank Holt and Norman Hart (collectively, "Plaintiffs"), by their attorneys, allege for their Verified Shareholder Derivative Complaint against defendants upon personal knowledge as to themselves and their own acts, and as to all other matters upon information and belief based upon, *inter alia*, the investigation made by and through their attorneys, as follows:

### SUMMARY OF THE ACTION

1.       This is a shareholder derivative action brought on behalf of nominal defendant Smith & Wesson Holding Corp. ("S&W" or the "Company"), by two of its shareholders against certain of the Company's officers and members of its Board of Directors (the "Board") asserting state law derivative claims for breach of fiduciary duty, abuse of control, gross mismanagement, waste of corporate assets and unjust enrichment.

2.      This derivative action arises from the Board's failure to institute and maintain internal controls and thereby permit the Company to engage in systematic violations of the U.S. Foreign Corrupt Practices Act of 1977 ("FCPA"), which prohibits companies from paying or offering to pay a foreign official anything of value to obtain a contract.  Importantly, the FCPA also requires companies to file periodic reports with the SEC and to keep books and records that accurately reflect business transactions and to maintain effective internal controls.

3.      Defendants caused S&W to fail to maintain internal accounting controls despite their obligation to do so under the FCPA.  Indeed, many S&W employees, including Amaro Goncalves, S&W's Vice President of Law Enforcement, International and U.S. Government Sales, violated the FCPA by diverting Company assets to pay bribes and kickbacks to government officials.  Defendants' failure to prevent this harm has caused substantial damage to S&W. Plaintiffs, on behalf of S&W, seek to recover damages against defendants to compensate the Company for these violations.

4.      Due to their conscious disregard for the fact that the Company lacked the internal accounting controls required by the FCPA, none of the defendants took any steps to prevent the unlawful conduct engaged in by certain Company executives.  Likewise, the Board has not held defendants accountable for causing harm to S&W and exposing the Company to serious reputational and pecuniary damages.  The inaction by the Board is not surprising given that defendants would have to sue themselves for failing to plan or maintain internal controls to ensure S&W's compliance with the FCPA in breach of their fiduciary duties.  This refusal to act on behalf of S&W has resulted in additional and substantial harm to the Company and is also a breach of the fiduciary duties owed to the Company.

2

5.      The conduct alleged herein is not the work of a rogue employee or business division outside the direct purview of the Board and senior management.  Rather, the conduct emanated from the highest levels of senior management and was deeply embedded in the Company's regular practices and corporate culture.

## JURISDICTION AND VENUE

6.      This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(2) in that Plaintiffs and defendants are citizens of different states and the amount in controversy exceeds $75,000.00, exclusive of interests and costs.  This action is not a collusive one to confer jurisdiction on a court of the United States that it would not otherwise have.

7.      Venue is proper in this district because a substantial portion of the wrongs complained of herein occurred in this district.  One or more of the defendants either resides in or maintains executive offices in this district, and defendants have received substantial compensation in this district by engaging in numerous activities and conduction business here, which had an effect in this district.

## PARTIES

8.      Plaintiff Frank Holt is currently a shareholder of S&W and has continuously been a shareholder of the Company since April, 2009.  Plaintiff Holt is citizen of the State of Florida.

9.      Plaintiff Norman Hart is and was a times relevant hereto, an owner and holder of S&W common stock.  Plaintiff Hart is a citizen of the State of Oregon.

10.     Nominal defendant S&W is a Nevada corporation with its headquarters located at 2100 Roosevelt Avenue, Springfield, Massachusetts 01104.  S&W is a U.S.-based, global provider of products and services for safety, security, protection, and sport.  S&W promotes itself as one of the world's leading manufacturers of firearms.  S&W manufactures a wide array of pistols,

revolvers, tactical rifles, hunting rifles, black powder firearms, handcuffs, and firearm-related products and accessories for sale to a wide variety of customers, including law enforcement and security agencies and officers, military agencies in the United States and throughout the world, gun enthusiasts, collectors, hunters, sportsmen, competitive shooters, and individuals desiring home and personal protection. S&W is the largest manufacturer of handguns and handcuffs in the United States, and the largest U.S. exporter of handguns. S&W is also a leading turnkey provider of perimeter security solutions to protect and control access to key military, governmental, and corporate facilities. S&W is a citizen of the states of Nevada and Massachusetts.

11. Defendant Michael F. Golden ("Golden") has served as the President and Chief Executive Officer and a director of S&W since December 2004. Mr. Golden was employed in various executive positions with the Kohler Company from February 2002 until joining S&W, with his most recent position being the President of its Cabinetry Division. Mr. Golden was the President of Sales for the Industrial/Construction Group of the Stanley Works Company from 1999 until 2002, Vice President of Sales for Kohler's North American Plumbing Group from 1996 until 1998, and Vice President – Sales and Marketing for a division of The Black & Decker Corporation where he was employed from 1981 until 1996. Defendant Golden is a citizen of the state of Connecticut.

12. Defendant Amaro Goncalves ("Goncalves") is a Vice President of S&W. In November, 2008 Goncalves was appointed to the newly created position of S&W Vice President of Law Enforcement, International and U.S. Government Sales. In that position, Goncalves is responsible for all aspects of S&W's international and domestic law enforcement sales and manages the Company's global military and government contract negotiations along with purchasing procedures. From November, 2004 until November 2008, Goncalves was S&W's

Director of International Sales.  On January 21, 2010, Goncalves was indicted for violation of the FCPA.  Defendant Goncalves is a citizen of the Commonwealth of Massachusetts.

13.      Defendant P. James Debney ("Debney") has served as Vice President of S&W since April 2010 and President of the Company's firearm division since November 2009.  Prior to that, Debney was President of Presto Products Company, a $500 million business unit of Alcoa Consumer Products from December 2006 until February 2009.  Debney was Managing Director of Baco Consumer Products, a business unit of Alcoa Consumer Products from January 2006 until December 2006, Manufacturing and Supply Chain Director from August 2003 until December 2005, and Manufacturing Director from April 1998 until July 2003.  During the time that Debney worked for the business units of Alcoa Consumer Products, its parent company, Alcoa, Inc., was under investigation and defending enforcement actions alleging that Alcoa, Inc. violated the FCPA by making corrupt payments for the purpose of securing sales of alumina in Bahrain, beginning as far back as 1993.  Defendant Debney is a citizen of the Commonwealth of Massachusetts.

14.      Defendant Mitchell A. Saltz ("Saltz") has served as a director of S&W since October 1998.  Saltz served as Chairman of the Board and Chief Executive Officer of the Company from February 1998 through December 5, 2003.  Defendant Saltz is a citizen of the state of Nevada.

15.      Defendant Robert L. Scott ("Scott") has served as a director of S&W since December 1999.  Scott served as a consultant to S&W from May 2004 until February 2006, President of the Company from December 1999 until September 2002, Chairman of S&W's wholly owned subsidiary, Smith & Wesson Corp., from January 2003 through December 5, 2003, and the President of Smith & Wesson Corp. from May 2001 until December 2002.  From December 1989 to December 1999, Scott served as Vice President of Sales and Marketing and

later as Vice President of Business Development of Smith & Wesson Corp.  Defendant Scott is a citizen of the state of Arizona.

16.     Defendant Jeffrey D. Buchanan ("Buchanan") was a director of S&W during the relevant period and at the time of the filing of this action.  Buchanan served as a director of S&W from November 2004 until January 3, 2011, at which time he resigned from the Board to be appointed as S&W's CFO.  In connection with his appointment as CFO, Buchanan was given an annual salary of $295,000, the right to participate in S&W's executive incentive compensation plan, as well as other employee benefits and perquisites, in addition to a sign-on bonus of $50,000, options to purchase 200,000 shares of S&W stock, and a lucrative severance and change of control agreement.  Throughout the relevant period, and at the time of the filing of this action, Buchanan was the chairman of the Audit Committee of the S&W Board.  Buchanan served from June 1986 until May 1996 as a business lawyer with O'Connor, Cavanagh, Anderson, Killingsworth & Beshears, a professional association, most recently as a senior member of that firm.  Defendant Buchanan is a citizen of the state of Arizona.

17.     Defendant John B. Furman ("Furman") has served as a director of S&W since April 2004.  Furman is a member of the Audit Committee of the S&W Board.  Furman was a senior member of the law firm of O'Connor, Cavanagh, Anderson, Killingsworth & Beshears, a professional association, from January 1983 until August 1998.  Defendant Furman is a citizen of the state of Arizona.

18.     Defendant I. Marie Wadecki ("Wadecki") has served as a director of S&W since September 2002.  Wadecki is a member Audit Committee of the S&W Board.  Defendant Wadecki is a citizen of the state of Michigan.

19.     Defendant Barry M. Monheit ("Monheit") has served as a director of S&W since February 2004.  As of January 3, 2011, Monheit assumed the role of interim Chairman of the Audit Committee of the S&W Board.  Since May 2009, Monheit has been a Senior Managing Director of FTI Palladium Partners, a financial consulting division of FTI Consulting, Inc., a New York Stock Exchange-listed global advisory firm dedicated to helping organizations protect and enhance enterprise value in an increasingly complex legal, regulatory, and economic environment.  One of the areas in which FTI Consulting, Inc. offers specialized services is in the area of internal corporate investigations regarding FCPA compliance.  Defendant Monheit is a citizen of the state of Arizona.

20.     The defendants identified in ¶¶ 11-13 are referred to as the "Officer Defendants" and the defendants identified in ¶¶ 11, 14-19 are referred to as the "Director Defendants." Collectively, the defendants named in ¶¶ 11-19 are referred to as the "Individual Defendants."

## THE INDIVIDUAL DEFENDANTS' FIDUCIARY DUTIES

21.     By reason of their positions as officers and/or directors and fiduciaries of S&W and because of their ability to control the business and corporate affairs of the Company, the Individual Defendants owed to S&W and its shareholders fiduciary obligations of trust, loyalty, good faith and due care, and were and are required to use their utmost ability to control and manage S&W in a fair, just, honest and equitable manner.  The Individual Defendants were and are required to act in furtherance of the best interests of S&W and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit.  The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of S&W, the absence of good faith on their part, and a

reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company.

22.     To discharge their fiduciary duties, the officers and directors of S&W were required to exercise reasonable and prudent supervision over the management, policies, practices and controls of the Company.  By virtue of such duties, the officers and directors of S&W were required to, among other things:

    a.     Manage, conduct, supervise and direct the business affairs of S&W in accordance with all applicable laws, including federal and state laws, regulations and policies of the Company;

    b.     Neither violate, nor permit any officer, director or employee of S&W to violate applicable laws, rules and regulations, including the FCPA;

    c.     Remain informed as to the status of S&W's operations, including its compliance with the FCPA and the financial reporting requirements under the FCPA and the federal securities laws, and upon receipt of notice or information of imprudent or unsound practices, to make a reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices; and

    d.     Conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock.

23.     In addition, S&W's foundational corporate documents (such as Board committee charters and the Corporate Guidelines) expressly detail the requirements of the Board's duties. These foundational corporate documents expressly require, among other things, that directors: (i) comply with the provisions of the FCPA; (ii) monitor the Company's compliance with all

applicable laws; (iii) provide full, fair, accurate, timely, and understandable disclosure in Company reports and documents; and (iv) disclose any deviation from strict performance of these obligations.

24.     S&W – a company whose business has global implications – and its shareholders depend and rely on Board members to carry out their fiduciary duties.  As stated in S&W's Code of Conduct:

> The U.S. Foreign Corrupt Practices Act prohibits giving anything of value, directly or indirectly, to officials of foreign governments or foreign political candidates in order to obtain or retain business.  It is strictly prohibited to make illegal payments to government officials of any country.

> In addition, the U.S. government has a number of laws and regulations regarding business gratuities that may be accepted by U.S. government personnel.  The promise, offer, or delivery to an official or employee of the U.S. government of a gift, favor, or other gratuity in violation of these rules would not only violate Company policy but could also be a criminal offense.  State and local governments, as well as foreign governments, may have similar rules.

> *  *  *

> Directors, officers, and employees should report any observed illegal or unethical behavior and any perceived violations of laws, rules, regulations, or this Code to appropriate personnel

25.     S&W senior management was also required to adhere to the Company's Code of Ethics for CEO and Senior Financial Officers (the "Officers' Ethics Code").  The Officers' Ethics Code specifically states:

- ***The Chief Executive Officer and each senior financial officer shall promptly bring to the attention of the Audit Committee any information he or she may have concerning any violation of this Code or the Company's Code of Business Conduct and Ethics, including any actual or apparent conflicts of interest between personal and professional relationships, involving any management or other employees who have a significant role in the Company's financial reporting, disclosures, or internal controls.***

- ***The Chief Executive Officer and each senior financial officer shall promptly bring to the attention of the Disclosure Committee, if applicable, and the Audit***

*Committee any information he or she may have concerning evidence of a material violation of the securities or other laws, rules, or regulations applicable to the Company and the operation of its business, by the Company or any agent thereof, or of violation of the Code of Business Conduct and Ethics or of these additional procedures.  Act ethically and with honesty and integrity ...*

- Strive to provide full, fair, accurate, timely and understandable disclosure in the periodic reports required to be filed by S&W with the Securities and Exchange Commission.

- *Comply with applicable rules and regulations of federal, state and local governments and other governmental regulatory agencies, be accountable with respect to such rules and regulations and promptly report violations of such rules and regulations to S&W's Corporate Secretary.*

- *Act in good faith, responsibly, with due care,* competence and diligence, without misrepresenting material facts or allowing their independent judgment to be subordinated or compromised.

- *Proactively promote ethical behavior* as a responsible partner among peers in their work environment.

(Emphases added).

26.      The Directors' Ethics Code and the Officers' Ethics Code (together, the "Ethics Codes") are nondiscretionary.  Rather, the Individual Defendants are required to follow the Ethics Codes and may not deviate from their terms.  The Individual Defendants have simply chosen to disregard the Ethics Codes as part of a conscious strategy to sacrifice compliance with the FCPA to achieve growth in the international segment of the Company's business.

27.      Defendants Buchanan (Chairman), Furman and Wadecki were members of the Board's Audit Committee at all relevant times and at the time of the filing of this action.  As members of the Audit Committee, defendants Buchanan, Furman and Wadecki have enhanced oversight duties as outlined in the Company's Audit Committee Charter, to review and monitor the Company's compliance with all legal and regulatory requirements.  Specifically the Audit Committee Charter states that the purpose of the Audit Committee is:

To provide assistance to the Board of Directors with respect to its oversight of the following:

- The integrity of the Company's financial statements.

- The Company's compliance with legal and regulatory requirements.

As such, they are directly responsible for overseeing S&W's compliance with the FCPA and have failed to prevent violations thereof, rendering them incapable of impartially investigating or taking appropriate action against themselves and others responsible for the wrongdoing alleged herein.

28.   The Audit Committee Charter further specifies that the "principle duties" of the Audit Committee, and the Company directors who sit on that committee, include the following:

In consultation with the independent auditor, management, and the internal auditor, if any, review the integrity of the Company's financial reporting processes, both internal and external.  In that connection, the Committee should obtain and discuss with management and the independent auditor reports from management and the independent auditor regarding (a) all critical accounting policies and practices to be used by the Company and the related disclosure of those critical accounting policies under "Management's Discussion and Analysis of Financial Condition and Results of Operations"; (b) analyses prepared by management and/or the independent auditor setting forth significant financial reporting issues and judgments made in connection with the preparation of the financial statements, including all alternative treatments of financial information within generally accepted accounting principles that have been discussed with the Company's management, the ramifications of the use of the alternative disclosures and treatments, and the treatment preferred by the independent auditor; (c) all alternative treatments of financial statements within generally accepted accounting principals that have been discussed with the Company's management, the ramifications of the use of alternative disclosures and treatments, and the treatment preferred by the independent auditor; (d) major issues regarding accounting principles and financial statement presentations, including any significant changes in the Company's selection or application of accounting principles; *(e) major issues as to the adequacy of the Company's internal controls and any specific audit steps adopted in light of material control deficiencies; (f) issues with respect to the design and effectiveness of the Company's disclosure controls and procedures, management's evaluation of those controls and procedures, and any issues relating to such controls and procedures during the most recent reporting period; (g) the effect of regulatory and accounting initiatives, as well as off-balance sheet structures on the*

*financial statements of the Company;* (h) any significant matters arising from any audit, including audit problems and difficulties, whether raised by management, the internal auditor, if any, and the independent auditor, relating to the Company's financial statements; and (i) any other material written communications between the independent auditor and the Company's management, including any "management" letter or schedule of unadjusted differences.

* * *

*Review periodically, with the Company's counsel, any legal matter that could have a significant impact on the Company's financial statements.*

Discuss with management and the independent auditor the Company's guidelines and policies with respect to risk assessment and risk management. The Committee will discuss the Company's major financial risk exposures and the steps management has taken to monitor and control such exposures.

*Prepare all reports required to be included in the Company's proxy statement, pursuant to and in accordance with applicable rules and regulations of the SEC.*

*Report regularly to the full Board of Directors. In this regard, the Committee will review with the full board any issues that arise with respect to the quality or integrity of the Company's financial statements, the Company's compliance with legal or regulatory requirements,* the performance and independence of the Company's independent auditor, and the performance of the internal audit function, if any.

(Emphasis added).

29.     The Individual Defendants, because of their positions of control and authority as directors, members of the Audit Committee and/or officers of S&W, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein. Because of their executive, managerial and/or directorial positions with S&W, each of the Individual Defendants had access to adverse, non-public information concerning the lack of a system of accounting controls that would have permitted them to know of and prevent the payment of illegal bribes and kickbacks. The Individual Defendants breached their fiduciary duties by failing to require S&W to implement internal controls in compliance with the FCPA or the FCPA's underlying directives

regarding books, records and internal accounting, which are designed to ferret out and ultimately prevent just the type of bribery and kickbacks that have occurred at S&W.

30.     At times relevant hereto, the Individual Defendants were the agents of each of the other Individual Defendants and were at all times acting within the course and scope of such agency.

31.     S&W's violations of the FCPA were facilitated by the Individual Defendants' knowing and/or reckless failure to establish a system of internal controls at S&W, in direct violation of the books, records and internal accounting requirements of the FCPA.  As a result, S&W has expended, and will continue to expend, significant sums of its capital, both reputational and economic, addressing the illegal and reprehensible bribes and kickbacks that were paid in its name.  Likewise, the illegal bribes and kickbacks have and will continue to irreparably damage S&W's corporate image and goodwill and jeopardize its ability to secure export permits and bid on any governmental procurement contracts.

## FACTUAL ALLEGATIONS

**A.     Background: The FCPA**

32.     As a result of SEC investigations in the mid-1970's, over 400 U.S. companies admitted making questionable or illegal payments in excess of $300 million to foreign government officials, politicians, and political parties.  The abuses ran the gamut from bribery of high foreign officials to secure some type of favorable action by a foreign government to so-called facilitating payments that allegedly were made to ensure that government functionaries discharged certain ministerial or clerical duties.  Congress enacted the FCPA to bring a halt to the bribery of foreign officials and to restore public confidence in the integrity of the American business system.

33.     The FCPA's anti-bribery provisions generally prohibit U.S. companies and citizens, foreign companies listed on a U.S. stock exchange, or any person acting while in the United States from corruptly paying or offering to pay, directly or indirectly, money or anything of value to a foreign official, a foreign political party, or a candidate for foreign political office for purposes of influencing any act or decision (including a decision not to act) of such official in his or her official capacity, inducing the official to do any act in violation of his or her lawful duty, or to secure any improper advantage in order to assist the payor in obtaining or retaining business for or with any person, or in directing business to any person.   In addition, the FCPA established accounting control requirements for issuers subject to either the registration or reporting provisions of the Exchange Act.

34.     The FCPA also requires every issuer to devise and maintain a system of internal accounting controls sufficient to provide reasonable assurances that: (i) transactions are executed in accordance with management's general or specific authorization; (ii) transactions are recorded as necessary to permit preparation of financial statements in conformity with Generally Accepted Accounting Principles ("GAAP") or any other criteria applicable to such statements; and (iii) to maintain accountability for assets.   Proof of a U.S. territorial nexus is not required for FCPA implication against U.S. companies and citizens and FCPA violations can, and often do, occur even if the prohibited activity takes place entirely outside of the United States.

35.     The FCPA is jointly enforced by the Department of Justice ("DOJ") and the SEC. The DOJ is responsible for all criminal enforcement and for civil enforcement of the anti-bribery provisions with respect to domestic concerns and foreign companies and nationals.   The SEC is responsible for civil enforcement of the anti-bribery provisions with respect to issuers.

36.     The following criminal penalties may be imposed for violations of the FCPA's anti-bribery provisions: corporations and other business entities are subject to a fine of up to $2,000,000; officers, directors, stockholders, employees, and agents are subject to a fine of up to $100,000 and imprisonment for up to five years.  Moreover, under the Alternative Fines Act, these fines may be quite higher – the actual fine may be up to twice the benefit that the defendant sought to obtain by making the corrupt payment.  Importantly, fines imposed on individuals may not be paid by their employer or principal.

37.     In addition to the criminal penalties, the Attorney General or the SEC, as appropriate, may bring a civil action for a fine of up to $10,000 against any firm as well as any officer, director, employee, or agent of a firm, or stockholder acting on behalf of the firm, who violates the anti-bribery provisions.  In addition, in an SEC enforcement action, the court may impose an additional fine not to exceed the greater of the gross amount of the pecuniary gain to the defendant as a result of the violation, or a specified dollar limitation.  The specified dollar limitations are based on the egregiousness of the violation, ranging from $5,000 to $100,000 for a natural person and $50,000 to $500,000 for any other person.

38.     The Attorney General or the SEC, as appropriate, may also bring a civil action to enjoin any act or practice of a firm whenever it appears that the firm (or an officer, director, employee, agent, or stockholder acting on behalf of the firm) is in violation (or about to be) of the anti-bribery provisions.

39.     In addition to the criminal and civil penalties and fines, under guidelines issued by the Office of Management and Budget, a person or firm found in violation of the FCPA may be barred from doing business with the Federal government.  Indictment alone can lead to suspension of the right to do business with the government.  The President has directed that no executive

15

agency shall allow any party to participate in any procurement or non-procurement activity if any agency has debarred, suspended, or otherwise excluded that party from participation in a procurement or non-procurement activity.

40.    Furthermore, a person or firm found guilty of violating the FCPA may be ruled ineligible to receive export licenses; the SEC may suspend or bar persons from the securities business and impose civil penalties on persons in the securities business for violations of the FCPA; the Commodity Futures Trading Commission and the Overseas Private Investment Corporation both provide for possible suspension or debarment from agency programs for violation of the FCPA; and a payment made to a foreign government official that is unlawful under the FCPA cannot be deducted under the tax laws as a business expense.

41.    In March of 2009 three distinct trends in the enforcement of FCPA enforcement were identified and publicly reported by legal analysts.  First, the number of FCPA matters pursued by the DOJ (including deferred prosecutions and non-prosecution agreements) and the SEC steadily increased between 2002 and 2008, including a sharp increase in enforcement actions against both corporation and individuals.  Secondly, there was a strong trend of actions against individuals being brought separately – often in advance – of charges against their employers and then, in all likelihood, following classic prosecutorial strategy of working up the chain of command, using the individuals to build the government's case against their superiors and eventually the company.  Third, penalties assessed against corporations have increased over the same period, both in the aggregate (including all fines, penalties, restitution, and disgorgement) and in individual cases.

**B.     Background: Smith & Wesson**

42.     S&W was founded in 1852 by Horace Smith and Daniel B. Wesson, who designed and marketed a lever-action, repeating magazine handgun that held a self-contained cartridge. Their venture ran into financial difficulties and they were forced to sell it, but a second partnership in 1856, manufacturing their new revolving-cylinder handgun (now known as the .22 rimfire) proved more successful.  The Civil War made S&W a leading firearms manufacturer.  In 1867 it began selling in Europe.  Mr. Wesson purchased Mr. Smith's interest in 1873.  S&W increased its international sales and reputation when it supplied the British in World War I and the Allies in World War II.

43.     The Wesson family sold S&W to Bangor Punta Corp. in 1965.  Lear Siegler Corporation then purchased Bangor Punta in 1984, thereby gaining ownership of S&W.  Next, Forstmann Little & Co. purchased Lear Siegler in 1986 and sold S&W shortly thereafter to Tomkins Corporation, an affiliate of U.K.-based Tomkins PLC.

44.     On May 11, 2001, Saf-T-Hammer Corporation acquired S&W from Tomkins PLC for U.S. $15 million, a fraction of the U.S. $112 million originally paid by Tomkins and then changed the name of the surviving company to Smith & Wesson Holding Corporation on February 15, 2002.

45.     The acquisition of Smith & Wesson was chiefly brokered by Saf-T-Hammer President Bob Scott, who had left S&W in 1999 because of a disagreement with Tomkins' policies.  After the purchase, Scott became the president of Smith & Wesson.  Scott announced that "We are proud to return this storied company to American ownership.  ***We intend to maximize the value of the name and to fully utilize the manufacturing, marketing, and***

*worldwide distribution assets of the company to create appreciation and value for our shareholders.*"  (Emphasis added).

46.     Since it was acquired by Saf-T-Hammer, S&W has continued to place an emphasis on increasing its sales.

47.     To build S&W's marketing presence in both the governmental/law enforcement and international markets, on September 23, 2004, S&W announced the promotion of Kurt Hindle to Director - Law Enforcement and Governmental Sales and the appointment of defendant Goncalves as Director - International Sales.   With respect to Goncalves, the Company press release announcing his appointment boasted that "Goncalves spent ten years with Colt's Manufacturing Company, where for seven years he was responsible for Colt's international sales and prior to that role, headed up the Company's Latin America operations.   His successful experience in international governmental and military sales with Colt's will be a significant new asset for the Company."

48.     Roy Cuny, President and CEO of S&W at the time went on to state "*[w]e are very pleased to have Kurt and Amaro [Goncalves] in the lead as we step up our efforts in the law enforcement and international markets.  We believe these are high potential growth markets for Smith & Wesson and have, therefore, made them high priorities in our growth plan.  The strength of these new placements underscores our objective to get our products to an expanded customer base, both at home and abroad.*"  (Emphasis added).

49.     In its 2005 annual report on Form 10-K, filed with the SEC on August 15, 2005, S&W again reaffirmed its intent to focus on increasing its presence in the governmental and international markets, stating "we are expanding our focus on the domestic law enforcement and military markets as well as international markets."

50.     Again, in the 2006 annual report on Form 10-K, filed with the SEC on July 14, 2006, S&W stated "In fiscal 2007, we will expand the M&P pistol line with additional calibers and compact versions.   The M&P pistol was designed specifically for military and law enforcement, and we expect this new line to help increase our share in those markets both within the United States and internationally."

51.     The importance of the governmental and international markets was further emphasized by defendants Monheit and Golden in a letter to shareholders included in S&W's 2006 Annual Report to Shareholders that stated:

> We secured our first major order in 15 years from the U.S. government. During the course of the year, we won $20 million in government business, totaling over 73,000 pistols for the Afghanistan National Police and Border Patrol. ***And despite federal export restrictions that we are working hard to change, we achieved growth of over 58% in international sales in fiscal 2006.***
>
> * * *
>
> ***Our focus in fiscal 2007 will remain fixed on making Smith & Wesson a leader in the global business*** of SAFETY, SECURITY, PROTECTION and SPORT. ***We will continue to visit Washington, driving legislative changes to create a more competitive position for our industry in international markets.   We will drive growth in our core firearms business, fueled by increased sales into sporting goods, the law enforcement, federal government, and international markets*** and supported by a robust product portfolio expanded with new products we will launch in fiscal 2007.

(Emphasis added).

52.     Again, in S&W's annual reports on Form 10-K for fiscal years 2007 through 2009, S&W has repeatedly emphasized the importance of the governmental and international markets, stating in each that "[w]ith the introduction of the M&P series of pistols and the growth of our Sigma Series and a full line of Model 1911 style pistols, we have significantly expanded the breadth and quality of our pistol offerings.   As a result of the expansion of the M&P pistol line with additional calibers and versions and customer demand for these products, pistols now account

for more of our revenue than revolvers.  ***We plan to position the M&P Series of pistols to help increase our share in the military and law enforcement markets both within the United States and internationally***.”  (Emphasis added).

53.     As a result of Goncalves’ success in increasing S&W’s sales in the international market, in January 2008, S&W issued a press release announcing it had named Amaro Goncalves to the newly created position of vice president of law enforcement, international and U.S. government sales.  The press release stated that in this newly created position “Goncalves will be responsible for all aspects of Smith & Wesson’s international and domestic L.E. sales.  ***In addition, he will manage the company’s global military and government contract negotiations along with purchasing procedures.***”  (Emphasis added).

54.     With respect to this promotion, Leland Nichols, the president of S&W at that time, stated “***Amaro [Goncalves]’s vast experience in international sales will be invaluable as we continue to execute our strategy to become a significant supplier of high-quality firearms and services to military and law enforcement agencies around the globe***.”  (Emphasis added).

## C.     Indictments and Investigations Under the FCPA

55.     Between 2004 and 2010, S&W reported an increase in international sales of 121.6%.  S&W’s success in the international market was not the result of defendant Gonclaves’ vast experience or the introduction of new products however, but rather by the use of illegal corrupt payments to officials of foreign governments to obtain contracts.

56.     On December 11, 2009, Goncalves was indicted for violation of the FCPA, conspiracy to commit violations of the FCPA, conspiracy to commit money laundering and aiding and abetting.  According to the indictment which was unsealed on January 19, 2010, between May, 2009 and December, 2009 Goncalves and “others known and unknown to the Grand Jury . . .

enrich[ed] themselves by making and attempting to make corrupt payments to foreign officials for the purpose of obtaining and retaining lucrative business opportunities."

57.     The indictment detailed the fact that Goncalves created two separate invoices for 1,825 pistols for sale to African "Country A."  The first invoice contained the actual price of the pistols, while the second invoice "included the true sales price plus the 20% 'commission' that would be used to pay and facilitate the bribe to Country A's Minister of Defense."  Then after payment was received for the pistols, Goncalves caused a wire transfer of the 20% "commission," *inter alia*, "for the purpose of making the corrupt payment to Country A's Minister of Defense."

58.     On January 19, 2010, Goncalves' indictment was unsealed and was widely reported in the press.  The trading price of S&W stock closed at $4.27 per share on January 15, 2010.  One week later, after the announcement of Goncalves' indictment, S&W stock had fallen to a close of $3.95, a decline of 7.5% in one week.

59.     On April 16, 2010, the Grand Jury issued a superseding indictment, which provided additional details, including the fact that the inflated invoices for the S&W pistols were sent to "Country A" from Springfield, Massachusetts – the location of S&W's headquarters.

60.     On July 1, 2010, in S&W's annual report on Form 10-K, S&W revealed that in conjunction with the prosecution of Goncalves, the DOJ served a Grand Jury subpoena on the Company and commenced an investigation of S&W for violations of the FCPA.  S&W specifically stated:

> **We are under investigation by the U.S. Department of Justice for potential FCPA violations.**
>
> \* \* \*
>
> Although we are cooperating fully with the DOJ in this matter and have undertaken a comprehensive review of company policies and procedures, the DOJ may determine that we have violated FCPA laws.  We cannot predict when this

21

investigation will be completed or its outcome. *There could be additional indictments of our company, our officers, or our employees. If the DOJ determines that we violated FCPA laws, or if our employee is convicted of FCPA violations, we may face sanctions, including significant civil and criminal penalties. In addition, we could be prevented from bidding on domestic military and government contracts, and could risk debarment by the U.S. Department of State. We also face increased legal expenses and could see an increase in the cost of doing international business.* We could also see private civil litigation arising as a result of the outcome of the investigation. In addition, responding to the investigation may divert the time and attention of our management from normal business operations. Regardless of the outcome of the investigation, the publicity surrounding the investigation and the potential risks associated with the investigation could negatively impact the perception of our company by investors, customers, and others.

*SEC Investigation*

Subsequent to the end of fiscal 2010, we received a letter from the staff of the SEC giving notice that the SEC is conducting a non-public, fact-finding inquiry to determine whether there have been any violations of the federal securities laws. It appears this civil inquiry was triggered in part by the DOJ investigation into potential FCPA violations. We have always taken, and continue to take seriously, our obligation as an industry leader to foster a responsible and ethical culture, which includes adherence to laws and industry regulations in the United States and abroad. Although we are cooperating fully with the SEC in this matter, the SEC may determine that we have violated federal securities laws. We cannot predict when this inquiry will be completed or its outcome. *If the SEC determines that we have violated federal securities laws, we may face injunctive relief, disgorgement of ill-gotten gains, and sanctions, including fines and penalties, or may be forced to take corrective actions that could increase our costs or otherwise adversely affect our business, results of operations, and liquidity. We also face increased legal expenses and could see an increase in the cost of doing business.* We could also see private civil litigation arising as a result of the outcome of this inquiry. In addition, responding to the inquiry may divert the time and attention of our management from normal business operations. Regardless of the outcome of the inquiry, the publicity surrounding the inquiry and the potential risks associated with the inquiry could negatively impact the perception of our company by investors, customers, and others.

(Emphasis added).

61.     The press release accompanying the Form 10-K also revealed that S&W $3.2 million in legal and consulting fees related the FCPA investigation and prosecution in fiscal year 2010, including $2.1 million in the fourth quarter alone.

62.     During a conference call with analysts held in conjunction with the issuance of the

Form 10-K, defendant Debney announced that the indictment of Goncalves and the FCPA

investigations were having a material impact on S&W's financial results, stating:

> Our international sales were down by 38% in the quarter due largely to the
> implementation of a more rigorous formal process through which we now qualify
> all international sales customers, agents and distributors.  Simply put, our process
> now more routinely identifies certain countries from which we will not accept
> orders, based on a variety of risk criteria.  The implementation of this has delayed,
> and in some cases eliminated, international revenue; however, it has also
> established a more thorough process for customer qualification, internal training
> and monitoring controls.  The international market remains a part of our long term
> growth strategy.  These procedures are protecting us by assuring that we grow our
> international business within a solid framework of compliance.   To further
> strengthen the control environment the Company has hired a seasoned Chief
> Compliance Officer.

63.     On September 9, 2010, the Company held a conference call with analysts in which

then CFO Bill Spengler announced that S&W had incurred an additional $2.1 million in legal and

consulting fees related to the FCPA investigation in the first quarter of 2011.   During the

conference call, when asked by one analyst whether this legal expense was "going to be a couple

of million bucks a quarter for a while or was it an anomaly in this quarter?  Just give a sense of

what that looks like this year?"  Matt Gelfand, an S&W President stated:

> That's hard, Reed.  What we are doing is just continuing to cooperate, in terms of
> the DOJ investigation.  It's been staying with us over the last two quarters ever
> since early this year when the allegations first came out.  I suspect that it will stay
> with us for a little period of time but I can't tell you the length of time it will stay
> with us.

64.     Again on December 8, 2010, the Company held a conference call with analysts in

which then interim CFO John Dineen revealed that S&W had incurred an additional $3.3 million

in legal and consulting fees related to the FCPA investigation in the second quarter of 2011.

65.     On March 10, 2011, the Company held another conference call with analysts to

discuss the Company's financial results for the third quarter of 2011.  While S&W did not reveal

the exact amount incurred in the quarter for legal and consulting fees associated with the FCPA investigation, defendant Buchanan attributed the vast majority of the $3.0 million increase in operating expense to the FCPA investigation, stating:

> Third-quarter operating expense, excluding the impairment, totaled $26.1 million, or 29.3% of sales, versus operating expenses of $23.1 million, or 25.4% of sales, last year. The increase was driven mostly by legal and consulting fees relating to our ongoing DOJ and SEC investigations. It was also impacted by higher operating expenses in Perimeter Security driven by cost increases in sales and management support functions.

> We recorded a net loss for the third quarter of $52.8 million, or $0.88 per diluted share, compared with net income of $3.1 million, or $0.05 per diluted share, last year. This – the loss this quarter can be broken down as follows. The impairment charge was $0.80 per share. The T/CA move was $0.01 per share. The DOJ and SEC investigation costs were $0.02 per share, and price repositioning and promotional activities were $0.04 per share.

66.     In sum, to date, S&W has incurred approximately $11.6 million in legal and consulting fees relating to the FCPA investigation, and defendant Goncalves' trial date has not yet even been set.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

67.     Plaintiffs bring this action derivatively in the right and for the benefit of S&W to redress the breaches of fiduciary duty and other violations of law by the Individual Defendants as alleged herein.

68.     Plaintiffs will adequately and fairly represent the interests of S&W and its shareholders in enforcing and prosecuting its rights, and it have retained counsel experienced in prosecuting this type of action.

69.     At the time this action was first initiated in the District Court, Clark County Nevada on September 3, 2010, the Board was comprised of seven directors: defendants Golden, Scott, Saltz, Buchanan, Furman, Wadecki, and Monheit. Plaintiffs did not make any demand on the

Board to institute this action because such a demand would have been futile, wasteful and useless act, particularly for the following reasons:

a.      As a result of their access to and review of internal corporate documents; conversations and connections with other corporate officers, employees and directors; and attendance at management and Board meetings, each of the Director Defendants knew, or were reckless in not knowing, that the Company did not have adequate internal controls to monitor the Company's compliance with FCPA requirements, even though the Company was emphasizing expansion of its international business and in fact experienced an increase of more than 120% in its international sales.   Consequently, each of the Director Defendants faces a substantial likelihood of liability for the claims asserted in this action;

b.      The Director Defendants were aware of the Company's emphasis on growth in the international segment of its business and the fact that the Company had increased its international sales by more than 120%.   In light of the recent increase in FCPA enforcement actions and the prominent recent prosecutions of companies such as Halliburton and Seimens, which alone resulted in over $1.5 billion in fines, penalties and forfeitures, the Director Defendants were aware of the importance of complying with the provisions of the FCPA in conjunction with S&W's dramatic increase in international sales.   Nevertheless, the Director Defendants utterly failed to institute adequate internal controls to monitor compliance with FCPA requirements.   Consequently, each of the Director Defendants faces a substantial likelihood of liability for the claims asserted in this action as well as civil and criminal penalties in the ongoing DOJ and SEC investigations;

c.      At times relevant hereto, the Audit Committee of the Board was comprised of defendants Buchanan (Chair), Furman and Weidecki.   As detailed in ¶¶ 27-28, *supra*, pursuant

to the express provisions of the Audit Committee Charter, as members of the Audit Committee defendants Buchanan, Furman and Weidecki were responsible for overseeing "[t]he integrity of the Company's financial statements," and "[t]he Company's compliance with legal and regulatory requirements."  In addition, the Audit Committee was responsible for reviewing "the adequacy of the Company's internal controls and any specific audit steps adopted in light of material control deficiencies; [and] issues with respect to the design and effectiveness of the Company's disclosure controls and procedures, management's evaluation of those controls and procedures, and any issues relating to such controls and procedures during the most recent reporting period." Defendants Buchanan, Furman and Weidecki utterly and consciously disregarded these duties with respect to the Company's FCPA compliance requirements.  The Audit Committee, among other things, failed to institute a sufficient system of internal controls to monitor S&W's compliance with the FCPA, failed to review with management S&W's compliance with the FCPA, failed to review with management the Company's internal controls, including the adequacy of internal controls regarding FCPA compliance at a time that the Company increased its international sales by more than 120%, failed to review with management the Company's compliance and Code of Ethics regarding the FCPA, and failed to review with management compliance by the Company's employees with the Company's Code of Ethics, including its express provisions with regards to the FCPA.  Consequently, each of the members of the Audit Committee faces a substantial likelihood of liability for the claims asserted in this action as well as civil and criminal penalties in the ongoing DOJ and SEC investigations;

        d.     The acts complained of herein constitute violations of fiduciary duties owed by S&W's Board and these wrongful and unreasonable acts are incapable of ratification.

e.      The  Director  Defendants,  because  of  their  inter-related  business, professional  and  personal  relationships,  have  developed  debilitating  conflicts  of  interest  that prevent  the  Board  from  taking  the  necessary  and  proper  action  on  behalf  of  the  Company  as requested  herein.   In  addition  to  the  conflicts  that  exist  as  a  result  of  their  participation  in  the flagrant  disregard  for  compliance  with  the  FCPA,  as  detailed  above,  the  majority  of  the  Board, including  the  defendants  listed  below,  are  subject  to  the  following  prejudicial  entanglements which  compromise  their  independence:

•      Defendant  Golden  has  served  as  President  and  CEO  of  S&W  since December,  2004,  and  in  2009  derived  total  compensation  of  $1,486,335  from  his employment  with  S&W  representing  a  substantial  portion  of  his  total  income.   As  a result,  defendant  Golden  is  incapable  of  making  an  independent  and  disinterested decision  as  to  whether  to  initiate  an  action  on  behalf  of  the  Company  against himself  and  the  other  members  of  the  Board.

•      Defendant  Scott  has  longstanding  business  relationship  with  the  Company and  the  other  members  of  the  Board.   Specifically,  Scott  served  as  a  consultant  to S&W  from  May  2004  until  February  2006  while  defendant  Golden  was  President and  CEO,  President  from  December  1999  until  September  2002,  Chairman  of S&W's  wholly  owned  subsidiary,  Smith  &  Wesson  Corp.,  from  January  2003 through  December  5,  2003,  President  of  Smith  &  Wesson  Corp.  from  May  2001 until  December  2002,  and  Vice  President  of  Sales  and  Marketing  and  later  as  Vice President  of  Business  Development  of  Smith  &  Wesson  Corp  from  December  1989 to  December  1999.   As  a  result,  defendant  Scott  is  incapable  of  making  an

independent and disinterested decision as to whether to initiate an action on behalf of the Company against himself and the other members of the Board.

• Defendant Saltz has longstanding business relationship with the Company and the other members of the Board.  Specifically Saltz served as Chairman of the Board and Chief Executive Officer of S&W from February 1998 through December 5, 2003, at the same time that defendant Scott served in various offices at S&W.  As a result, defendant Saltz is incapable of making an independent and disinterested decision as to whether to initiate an action on behalf of the Company against himself and the other members of the Board.

• Defendant Buchanan, chairman of the Audit Committee, served from June 1986 until May 1996 as a business lawyer with O'Connor, Cavanagh, Anderson, Killingsworth & Beshears.  Defendant Furman, a member of the Audit Committee, was also a senior member of the law firm of O'Connor, Cavanagh, Anderson, Killingsworth & Beshears, a professional association, from January 1983 until August 1998.  Because of the longstanding business and personal ties between defendants Buchanan and Furman, these defendants are incapable of making an independent and disinterested decision as to whether to initiate an action on behalf of the Company against themselves, fellow members of the Audit Committee and the other members of the Board.

• Since the filing of this action, as a reward for his failure to properly monitor the implementation of internal controls sufficient to assure compliance with the FCPA while he served as Chairman of the Board's Audit Committee, Defendant Buchanan has been appointed CFO of S&W and rewarded with an annual salary of

28

$295,000, the right to participate in S&W's executive incentive compensation plan, as well as other employee benefits and perquisites, a sign-on bonus of $50,000, options to purchase 200,000 shares of S&W stock, and a lucrative severance and change of control agreement.  As a result, defendant Buchanan is incapable of making an independent and disinterested decision as to whether to initiate an action on behalf of the Company against himself and the other members of the Board.

f.      Each of the Director Defendants knew of and/or directly benefited from the wrongdoing complained of herein;

g.      In order to bring this suit, all of the directors of S&W would be forced to sue themselves and persons with whom they have extensive business and personal entanglements, which they will not do, thereby excusing demand;

h.      The acts complained of constitute violations of the fiduciary duties owed by S&W's officers and directors and these acts are incapable of ratification; and

i.      Moreover, despite the Individual Defendants having knowledge of the claims and causes of action raised by Plaintiffs, the current Board has failed and refused to seek to recover for S&W for any of the wrongdoing alleged by Plaintiffs herein.

## COUNT I

### Against All Individual Defendants for Breach of Fiduciary Duty

70.     Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

71.     The Individual Defendants owed and owe S&W fiduciary obligations.  By reason of their fiduciary relationships, these defendants owed and owe S&W the highest obligation of good faith, fair dealing, loyalty and due care.

72.     The Individual Defendants, and each of them, violated and breached their fiduciary duties of care, loyalty, reasonable inquiry, oversight, good faith and supervision.

73.     Each of the Individual Defendants had actual or constructive knowledge of the misconduct alleged herein, including that they utterly failed to institute a system of internal controls to monitor the Company's compliance with the FCPA and permitted the Company and its employees to violate the FCPA by making corrupt payments to officials of foreign governments in exchange for lucrative contracts.  These actions could not have been a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

74.     As a direct and proximate result of the Individual Defendants' failure to perform their fiduciary obligations, S&W has sustained significant damages.  As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

75.     Plaintiffs, on behalf of S&W, have no adequate remedy at law.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs demand judgment as follows:

A.     Against all of the Individual Defendants and in favor of the Company for the amount of damages sustained by the Company as a result of the Individual Defendants' breaches of fiduciary duties;

B.     Awarding to S&W restitution from the Individual Defendants, and each of them, and ordering disgorgement of all profits, benefits and other compensation obtained by the Individual Defendants;

C.     Awarding to Plaintiffs the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

D.     Granting such other and further relief as the Court deems just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.


Dated: July 20, 2011

**HUTCHINGS, BARSAMIAN, MANDELCORN & ZEYTOONIAN, LLP**


**/s/Theodore M. Hess-Mahan**
Theodore M. Hess-Mahan (BBO # 557109)
110 Cedar Street, Suite 250
Wellesley Hills, MA 02481
Telephone: (781) 431-2231
Facsimile: (781) 431-8726

**FARUQI & FARUQI, LLP**
Beth A. Keller
369 Lexington Avenue, 10th Floor
New York, New York 10017
Telephone: (212) 983-9330
Facsimile: (212) 983-9331

**GARDY & NOTIS, LLP**
Mark C. Gardy
James S. Notis
Charles A. Germershausen
560 Sylvan Avenue
Englewood Cliffs, New Jersey 07632
Telephone: (201) 567-7377
Facsimile: (201) 567-7337

*Counsel for Plaintiffs*